J-A07006-24

J-A07007-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: F.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1439 MDA 2023 |

Appeal from the Order Entered September 15, 2023
In the Court of Common Pleas of Huntingdon County
Juvenile Division at No: CP-31-DP-0000018-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: A.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: F.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1440 MDA 2023 |

Appeal from the Order Entered September 15, 2023
In the Court of Common Pleas of Huntingdon County
Juvenile Division at No: CP-31-DP-0000030-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: L.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: F.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1441 MDA 2023 |

Appeal from the Order Entered September 14, 2023
In the Court of Common Pleas of Huntingdon County
Juvenile Division at No: CP-31-DP-0000031-2023

J-A07006-24

J-A07007-24

| | | |
|---|---|---|
| IN THE INTEREST OF: E.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: F.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1442 MDA 2023 |

Appeal from the Order Entered September 15, 2023
In the Court of Common Pleas of Huntingdon County
Juvenile Division at No:  CP-31-DP-0000032-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: O.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: F.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1443 MDA 2023 |

Appeal from the Order Entered September 15, 2023
In the Court of Common Pleas of Huntingdon County
Juvenile Division at No:  CP-31-DP-0000033-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1444 MDA 2023 |

Appeal from the Order Entered September 15, 2023
In the Court of Common Pleas of Huntingdon County
Juvenile Division at No:  CP-31-DP-0000034-2023

J-A07006-24

J-A07007-24

| | | |
|---|---|---|
| IN THE INTEREST OF: W.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.F., MOTHER | : : : : : : : | |
| | : | No. 1445 MDA 2023 |

Appeal from the Order Entered September 15, 2023
In the Court of Common Pleas of Huntingdon County
Juvenile Division at No: CP-31-DP-0000035-2023

BEFORE: STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.: **FILED: JUNE 14, 2024**

In these consolidated cases, F.F. ("Father") appeals the September 15, 2023 orders that adjudicated as dependent his daughter, G.F., born in June 2007; his two sons, O.F., born in February 2009, and E.F., born in March 2012; and his daughters, L.F., born in March 2015; and A.F., born in August 2021. Separately, J.F. ("Mother") appeals the September 15, 2023 orders that adjudicated as dependent her biological sons, L.M., born in April 2014; and W.M., born in March 2016.[1] After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] We have consolidated these cases *sua sponte* pursuant to Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal."). Instantly, Father and Mother ("Parents") have raised identical issues concerning the same factual and procedural events in their respective appeals and briefs.

- 3 -

We gather the relevant factual and procedural history of this matter from the certified record. Father is the natural father of G.F., O.F., E.F., L.F., and A.F., and the stepfather of L.M. and W.M. Mother is the natural mother of L.M., W.M., and A.F., and stepmother to the remaining children. Parents have been married since 2020, after Father's first wife and natural mother of G.F., O.F., E.F., and L.F., passed away in 2019.[2] *See* N.T., 9/13/23, at 16, 35. Parents have resided with G.F., O.F., E.F., L.M., L.F., W.M., and A.F. (collectively, "the Children") on a family farm located in Warriors Mark Township, Huntingdon County, Pennsylvania. Father works remotely in information technology and Mother is a stay-at-home parent. *See* N.T., 8/25/23, at 26. We also gather that Children have been homeschooled for the entirety of their lives. *See id.* at 24; N.T., 9/13/23, at 35-36.

Huntingdon County Children and Youth Services ("CYS" or "the Agency") first became involved with this family on June 17, 2023, when Father contacted the Agency to unsuccessfully request that G.F. be committed to a "juvenile facility" after she attempted to "run away" from Parents' home on seven different occasions. *See* N.T., 9/13/23, at 3-4, 35. Thereafter, on June 19, 2023, the Agency received a ChildLine report indicating that G.F. did not

---

[2] The natural father of L.M. and W.M. passed away in approximately 2015. *See* N.T., 8/25/23, at 28, 32. We also discern that Mother has a third adult child who also resides in Parents' home. *See id.* at 32.

- 4 -

feel safe in Parents' home and alleging, *inter alia*, that Parents were restraining her in the home using leather dog leashes and zip ties. ***See id.*** at 34-35.

That same day, CYS caseworker Christi Shawley responded to the family residence. Initially, Parents believed that Ms. Shawley was visiting in response to Father's earlier request that G.F. be institutionalized. To that end, Parents initially responded favorably to Ms. Shawley's presence and repeated their shared desire to have G.F. removed. ***See id.*** at 35. Parents' demeanors soured, however, when Ms. Shawley informed them of the Agency's concerns. Thereafter, Parents refused to cooperate with Ms. Shawley's investigation. ***See id.*** at 4-6, 35-36. Specifically, they would not permit Ms. Shawley to enter their home or to speak with any of the Children. ***See id.***

Ms. Shawley called upon the assistance of the Pennsylvania State Police ("the PSP"), who responded to the scene. Eventually, Ms. Shawley was able to extricate, examine, and interview G.F. for approximately fifteen minutes at a short distance from the home, but still within Parents' line of sight and hearing. ***See id.*** at 36-37, 43. During this brief interaction, Ms. Shawley noted multiple bruises on G.F.'s right wrist, which G.F. confirmed were from a zip tie. ***See id.*** at 36. G.F. also substantiated that Parents were confining her in the home by using a leash connected to her belt loop. ***See id.*** G.F. also averred that Mother had struck her and given her a bloody nose while trying to prevent G.F. from running away during a previous incident. ***See id.*** at 12, 37-38. Ms. Shawley also reported that many of G.F.'s answers

appeared to be "scripted" and "very hesitant," which Ms. Shawley believed were caused by Parents' close proximity. ***See id.*** at 37, 44-45.

On June 27, 2023, CYS filed a petition alleging that G.F. was a dependent child. Robert M. Covell, Esquire, was appointed to serve as her guardian *ad litem* ("GAL"). The court held an initial dependency hearing with respect to G.F. on July 25, 2023. Therein, CYS requested and was granted a continuance in order to complete its investigation. ***See*** N.T., 7/25/23, at 1-4. At the conclusion of this brief proceeding, the trial court granted an oral request advanced by Parents' counsel and appointed Andrea Lehman, Esquire, to serve as G.F.'s legal interest counsel. ***See id.*** at 3.

On August 4, 2023, G.F. absconded from Parents' home and began residing with her maternal grandparents ("Maternal Grandparents") in Phillipsburg, Pennsylvania. ***See*** N.T., 9/13/23, at 11, 17. It also came to light that Parents were attempting to enroll G.F. in intervention programs for troubled teens located out of state. ***See id.*** at 12-14. Specifically, Father explained that Parents were "looking for a private solution for [G.F.] instead of allowing CYS to choose" what occurred. ***See id.*** at 13. These events were not contemporaneously disclosed to the trial court. ***See id.*** at 12-14.

On August 23, 2023, the Agency received a second ChildLine report alleging that Parents were utilizing inappropriate physical discipline and corporal punishment in the home. The same day, CYS was awarded emergency protective custody of the Children. CYS caseworkers and PSP

troopers cooperated in removing the Children. During the removal, Mother extolled the Children to not speak with representatives of the Agency without Parents' counsel present. **See** N.T., 9/13/23, at 40. On August 25, 2023, the trial court held a shelter care hearing and affirmed the Children's placement.[3]

During the shelter care hearing, Father denied using a leash or zip ties to restrain G.F. **See** N.T., 8/25/23, at 7-11. However, he invoked his privilege against self-incrimination pursuant to the Fifth Amendment to the U.S. Constitution when asked if anyone in the home had used zip ties or a leash to restrain G.F. **See id.** at 10-12. Father also invoked the Fifth Amendment when asked if he uses a "wooden paddle" to discipline the Children. **See id.** at 15. Father also admitted that Parents continued to refuse CYS access to his home and the Children up until their removal. **See id.** at 28.

Also on August 25, 2023, CYS filed dependency petitions with respect to O.F., E.F., L.M., L.F., W.M., and A.F. On September 13, 2023, the court held a consolidated hearing on the various petitions pertaining to the Children. Therein, G.F., E.F., L.F., Mother, and CYS director Kelvin Abrashoff testified. At the time of this hearing, G.F. was sixteen years old, E.F. was eleven years old, and L.F. was eight years old. They were interviewed *in camera* with the

---

[3] G.F., L.F., W.M., and A.F. have been placed in kinship care with Maternal Grandparents. **See** N.T., 9/13/23, at 71. O.F., E.F., and L.M. were placed in foster care with the family's pastor. **See id.**

attorneys for each party present.[4]  Mother and Mr. Abrashoff testified in open court.  The Agency also admitted the testimony adduced during the prior hearings.  **See** N.T., 9/13/23, at 1.  During her testimony, we note that Mother invoked her Fifth Amendment right against self-incrimination "when asked about the incident in which she struck G.F. in the process of stopping her from escaping over a fence, about her use of the dog leash on G.F., and about what forms of discipline she uses on the Children."  Trial Court Opinion, 11/21/23, at ¶ 44 (citing N.T., 9/13/23, at 58-59, 60, 66).

On September 15, 2023, the trial court filed orders of adjudication and disposition at the above-captioned docket numbers adjudicating the Children dependent within the meaning of the Juvenile Act, 42 Pa.C.S. §§ 6301–65 ("the Act").  Specifically, the trial court found that the Children were "without proper care or control, subsistence, education as required by law, or other care or control necessary for [their] physical, mental, or emotional health, or morals."  42 Pa.C.S. § 6302; **see also** Orders of Adjudication, 9/15/23, at 2. Additionally, the trial court determined that G.F. was also dependent due to having "committed a specific act or acts of habitual disobedience of the reasonable and lawful commands of [her] parent, guardian, or other custodian" and "being ungovernable and found to be in need of care,

---

[4]  Attorney Covell was appointed to serve as GAL for the remaining Children.

treatment, or supervision." 42 Pa.C.S. § 6302; *see also* Order of Adjudications, 9/15/23, at 2.

On October 12, 2023, Father filed separate, timely notices of appeal with respect to the adjudications concerning G.F., O.F., E.F., L.F., and A.F. The same day, Mother filed separate, timely notices of appeal with respect to the adjudications respecting L.M. and W.M. Parents also submitted timely concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On November 21, 2023, the trial court filed an opinion jointly explaining its rationale pursuant to Rule 1925(a)(2)(ii).

Parents have raised the following issues for our consideration:[5]

1. Did the use of corporal punishment exceed parental privilege or contribute to mental or physical harm to the [C]hildren?

2. Whether the petition and order for general protective custody was based on a faulty legal and factual premise?

3. Were the [C]hildren without proper care or control, subsistence, education as required by law, or other care or control necessary for their physical, mental[,] or emotional health or morals?

4. Whether an in-home dependency or general protective services would have been sufficient to address any concerns that the court and the [A]gency had regarding the family's disciplinary practices, thus alleviating the need for removal of the [C]hildren from the family home?

---

[5] Although Parents initiated separate appeals and have submitted individualized briefs and reproduced records, those submissions are functionally identical. *See* Mother's Brief at 2; Father's Brief at 2. To avoid confusion, we collectively refer to and cite to "Parents' Brief" in this writing.

Parents' Brief at 4 (issues reordered for ease of disposition).

Our general standard of review in this context is well-established:

Our scope of review in child dependency cases is limited in a fundamental manner by our inability to nullify the fact-finding of the trial court. We accord great weight to the hearing judge's findings of fact because the judge is in the best position to observe and rule upon the credibility of the witnesses. Given this unique posture, we will not overrule the findings of the trial court if they are supported by competent evidence[.]

*Interest of R.C.-G.*, 292 A.3d 582, 587 (Pa. Super. 2023). We are not required, however, to accept the trial court's evidentiary inferences or conclusions of law. *See id.* Overall, it is this Court's responsibility "to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *In re R.W.J.*, 826 A.2d 10, 12 (Pa. Super. 2003).

In pertinent part, the Act defines a "dependent child" as a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302. "A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety, or welfare of the child at risk[.]" *Id.* In order to adjudicate a child dependent, "the court must determine that the above definition has been met by clear and convincing evidence." *In re L.V.*, 127 A.3d 831, 835 (Pa. Super. 2015). Clear and convincing evidence is "evidence that is so clear, direct, weighty

and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re J.C.*, 5 A.3d 284, 288 (Pa. Super. 2010) (cleaned up)

With these basic legal parameters in mind, we turn to Parents' first claim for relief. Therein, they assert that the trial court's dependency findings violated their "right and privilege" to utilize physical corporal punishment under Pennsylvania law. Parents' Brief at 22 ("Absent a substantial risk of death, disfigurement, serious bodily injury, gross degradation, extreme pain or mental distress, Pennsylvania accepts corporal punishment as a permissible means of child discipline, provided, of course, that the parent does not act with malicious intent in punishing the child."). Parents argue "[t]he Agency did not prove malicious intent in this case, or that [Parents] were acting out in anger against the [C]hildren when imposing disciplinary measures." *Id.*

In support of this contention, Parents rely upon a number of cases and statutes concerning the parameters of "child abuse" as defined pursuant to the Child Protective Services Law ("CPSL"),[6] the Protection from Abuse Act ("PFAA"),[7] and the Crimes Code.[8] *See Interest of J.H.*, 293 A.3d 606, at *3-*6 (Pa. Super. 2023) (unpublished memorandum) (determining whether

---

[6] *See* 23 Pa.C.S. §§ 6301-88.

[7] *See* 23 Pa.C.S. §§ 6101-22.

[8] *See* 23 Pa.C.S. §§ 101-9546.

- 11 -

parents had committed "child abuse" as defined at 23 Pa.C.S. § 6303(b.1) of the CPSL); *Chronister ex rel. Morrison v. Brenneman*, 742 A.2d 190, (Pa. Super. 1999) (considering whether a single incident of corporal punishment administered by a parent constituted "abuse" as defined at 23 Pa.C.S. § 6102(a) of the PFAA); *Boland v. Leska*, 454 A.2d 75, 78 (Pa. Super. 1982) (adjudicating in a custody action whether two reported incidents of a parent striking their child rose to the level of "child abuse" as defined by the Crimes Code at 18 Pa.C.S. § 509(1)). Parents have also invoked 23 Pa.C.S. § 6304(d), which provides that "nothing" in the CPSL "shall be construed to restrict the generally recognized existing rights of parents to use reasonable force on or against their children for the purposes of supervision, control and discipline of their children."

We find Parents' legal arguments on this particular point to be inapt. The instant case does not implicate criminal charges advanced under the Crime Code or findings of abuse rendered pursuant to the provisions and definitions applicable to proceedings under the PFAA or the CPSL. Indeed, Parents' own brief acknowledges as much. *See* Parents' Brief at 21 ("The petitions filed in these cases did not allege child abuse or seek a finding of abuse."). At bedrock, Parents are essentially contending that the trial court was required to conclude that Parents had committed "abuse" within the meaning of these various additional statutes in order to adjudicate the Children dependent. We must disagree.

Our case law undercuts Parents' argument. In dependency proceedings, it is generally true that the trial court's evaluation and the definitions of dependency pursuant to the Act are focused upon the behavior of the parent vis-à-vis the child. *See In re L.J.*, 691 A.2d 520, 525 (Pa. Super. 1997). However, this Court has held that the Act "does not require proof that the parent has committed or condoned abuse, but merely evidence that the child is without proper parental care." *In re R.P.*, 957 A.2d 1205, 1211 (Pa. Super. 2008) (citing *In re R.R.*, 686 A.2d 1316, 1317-18 (Pa. Super. 1996)). Moreover, "[a] finding of dependency is not the same thing as a determination of the best interests of the child[.]" *Matter of Jackson*, 448 A.2d 1087, 1090 (Pa. Super. 1982). Rather, the legal standard for an adjudication of dependency is whether a child is without "**proper** parental care," defined as "care or control necessary for his physical, mental, or emotional health or morals." *R.R.*, 686 A.2d at 1317-18 (emphasis in original). We acknowledge that our review will unavoidably entail an examination and assessment of the reasonableness of Parents' use of corporal punishment in their home. However, Parents have not provided any arguable support for the proposition that their use of such parenting methods must rise to the level of child abuse in order to declare the Children dependent. *Cf. R.P.*, 686 A.2d at 1317-18.

Based upon the foregoing, we decline Parents' invitation to review the trial court's findings under the inapposite statutory definitions noted above. Since this appeal does not implicate or touch upon any findings of child abuse

pursuant to the CPSL, the PFAA, or the Crimes Code, we will confine our review of the trial court's holdings to the legal standards governing dependency. *See id.* Therefore, no relief is due with respect to Parents' first claim for relief.

Parents' second claim for relief alleges that the trial court should have dismissed the Agency's dependency petitions concerning the Children prior to holding a hearing. *See* Parents' Brief at 28 ("The factual and legal allegations were insufficient even as alleged to support the findings of dependency or result in removal of the [C]hildren for [sic] the home. . . . [T]he court . . . should not have proceeded to hearing the Agency's claims that the [C]hildren were dependent as alleged."). Tellingly, however, Parents have failed to provide any citations to pertinent legal authorities, or to the certified record, in support of this particular argument. *See id.* at 26-28. Accordingly, Parents have waived this claim for lack of development. *See C.H.L. v. W.D.L.*, 214 A.3d 1272, 1276 (Pa. Super. 2019) ("It is well-established that the failure to develop an argument with citation to, and analysis of, pertinent authority results in waiver of that issue on appeal.") (citing Pa.R.A.P. 2119(b)).

Even assuming, *arguendo*, that Parents had not waived this issue, we note that the dependency petitions filed by the Agency noted concerns regarding inappropriate physical discipline that was resulting in injuries to at least two children, excessive corporal punishment, and Parents' continued inability to control the actions of the Children, *i.e.*, G.F.'s persistent attempts to run away from the family home. *See* Dependency Petition, 6/7/23, at 3;

Dependency Petition, 8/25/23, at 3-5.[9]  As discussed further *infra*,

substantiated allegations of this type are sufficient to establish dependency.

In their third claim for relief, Parents assert that the evidence adduced

by the Agency was insufficient to establish that the Children are dependent as

defined in the Act.[10/11]  *See* Parents' Brief at 15 ("The parents in this case

_____

[9] We note that the dependency petitions filed with respect to all the Children, except for G.F., were substantially identical.

[10] We note that Parents have essentially conceded that G.F. was dependent due to her ungovernable behavior.  *See* Parents' Brief at 17 ("The parents did not contest the fact that [G.F.] was dependent on the basis of her habitual disobedience and running away from home.").  On the basis of this admission, alone, we could affirm the order adjudicating G.F. dependent.  *See* 42 Pa.C.S. § 6302.  As discussed further *infra*, however, it behooves us to discuss the trial court's findings as to lack of proper parental care and control.

[11] Parents also assert that the trial court should not have been permitted to consider their refusals to cooperate with the Agency's investigation or permit access to their home.  *See* Parents' Brief at 18 ("The lack of cooperation and the parents' reliance on their constitutional rights should not be considered in favor of a finding of dependency.").  A significant portion of their brief is devoted to a discussion of *Interest of Y.W.-B.*, 265 A.3d 602 (Pa. 2021). *See* Parents' Brief at 18-19.  Therein, our Supreme Court determined that the protections of the Fourth Amendment to the U.S. Constitution and Article I, Section 8 of the Pennsylvania Constitution apply in the context of "searches conducted in civil child neglect proceedings, which have the same potential for unreasonable government intrusion into the sanctity of the home" as similar searches conducted during criminal investigations.  *Id.* at 627-28.

Specifically, Parents reference *Y.W.-B.* by way of arguing that it was improper for the trial court to take note of Parents' lack of cooperation with the investigations conducted by CYS.  *See* Parents' Brief at 18 ("[Parents'] reliance on their constitutional rights should not be considered in favor of a finding of dependency.").  There is no dispute that Parents invoked their Fourth Amendment rights in refusing CYS access to their home.  Nonetheless,
*(Footnote Continued Next Page)*

were providing proper parental care to their children and they should not have been adjudicated [dependent].").  We must disagree.

Overall, the trial court concluded that the "the facts show that [Parents] have gone beyond the parental privilege to educate and discipline their children . . . and created a home environment that can only be characterized as physically, psychologically, and emotionally abusive."  Trial Court Opinion, 11/21/23, at 1-2.  In particular, the trial court found the testimony of G.F. to be credible and compelling, while finding Parents' assertions to be largely incredible and self-serving.  **See id.** at 1-42.  Our review reveals that there is ample support for the trial court's findings as to dependency.

As indicated by the trial court, the testimony of G.F. concerning Parents' behavior following the death of G.F.'s biological mother paints a troubling picture of the dramatic changes to the family dynamic.  In particular, G.F.

_____

Parents' reliance upon this case is unavailing.  The holding in **Y.W.-B.** solely concerned whether there was probable cause to support the issuance of an order compelling a parent to permit a search of their home.  **See Y.W.-B.**, 265 A.3d at 635 ("Mother's constitutional rights were violated.  The order compelling her cooperation with a governmental intrusion into her home was deficient for want of probable cause.").

In sharp contrast, CYS did not request any such directive in the instant case, and the trial court explicitly declined to order Parents to submit to a search of their home.  **See** N.T., 7/25/23, at 2 ("I'm not going to tell [Parents] to allow the Agency in the home.").  Thus, Parents' invocation of their Fourth Amendment rights successfully precluded a search of their home.  Accordingly, **Y.W.-B.** does not provide any arguable basis for relief.  Overall, Parents have provided no legal authority in support of their bald suggestion that a trial court is precluded from considering a parent's lack of cooperation with CYS investigations in conducting a civil dependency adjudication.  No relief is due.

- 16 -

reported that Parents' use of physical corporal punishment in the home quickly shifted from a rare occurrence prior to Father's marriage to Mother, to a daily ritual afterwards. *See* N.T., 9/13/23, at 14-17. Specifically, G.F. reported that the younger children—L.F., W.M., L.M., and A.F.—were beaten on their bare buttocks with a wooden paddle for every infraction that they committed during the course of the day. *See id.* These beatings were severe enough that the wooden paddle broke in use. *See id.* at 17, 44, 48-49. Parents both participate in administering punishment, with Mother spanking the Children in the mornings and Father spanking them in the evening. *See id.* at 15, 47. In particular, L.F.'s testimony was revealing concerning the frequency and timbre of the physical discipline meted out by Parents. She reported that Parents spanked her "constantly" for "disobeying" them. *See* N.T., 9/13/23, at 43-44. L.F. also testified that she regularly suffered bruising from these beatings.[12] *See id.* Both G.F. and L.F. reported that Parents also had warned the Children not to tell anyone about their use of corporal punishment in the home. *See id.* at 13, 45-46.

The older children—G.F., E.F., and O.F.—were not punished in this fashion due to their age. Instead, they were forced to undertake strenuous physical exercise at Parents' direction and had their free time restricted in

_____

[12] It is unclear whether Parents ceased using physical discipline upon L.F. once they realized they were bruising her, as the testimony was inconsistent on this point. *See* N.T., 9/13/23, at 44-47, 53.

half-hour increments for every incident of misbehavior.[13]  Both G.F. and E.F. confirmed the use of these discipline tactics by Parents.  *See id.* at 31, 52-56.  Specifically, G.F. averred she had been forced to do as many as 300 push-ups in a single day, with up to one hundred repetitions at one time.  *See id.* at 31.  G.F. also detailed that Mother had forced her to do sets of push-ups with 40-pound paving stones placed upon her back on multiple occasions.  *See id.* at 18.  Finally, G.F. also reported that Mother had singled out G.F. for specialized punishment by intentionally destroying G.F.'s possessions from her birth mother.  *See id.* at 33-34.  Mother admitted that she had disposed of "books and movies" that were important to G.F.  *See id.* at 68.

During their testimony, G.F., E.F., and L.F. each described the scope of what qualified as "misbehavior" in Parents' home as being quite broad and loosely defined.  Specifically, E.F. explained that he had been punished for behaviors ranging from "not following directions or forgetting something or not asking questions and doing my own thing."  *See id.* at 52-53.  In her testimony, L.F. seemed largely unable to fully understand why she was physically punished by Parents so frequently.  *See id.* at 48 ("It just constantly happens.").  Finally, G.F. averred that she and her siblings were punished for

---

[13]  G.F. and E.F. both explained that Parents provided the Children with two hours of free time per day, which was reduced in half-hour increments based on every incident of "bad" behavior.  *See id.* at 31-32, 52-56.  G.F. averred that Parents had informed her that she would have no free time to herself for at least "a year" and potentially as long as two years, at the time of her removal by the trial court.  *See id.* at 32, 36.

- 18 -

"[n]ot following instructions, not working promptly or diligently, being rude to another sibling like a normal young child would." **See id.** at 15.

G.F.'s testimony reflects that she began trying to run away from Parents' home because she no longer felt safe in Parents' care:[14]

_____

[14] During the course of these proceedings, G.F. submitted a letter to the trial court wherein she attempted to retract some of her allegations concerning Parents. **See** Parents' Exhibit 13. G.F. explained, however, that she had only written the letter at Mother's urging. **See** N.T., 9/13/23, at 26 ("My mother – my stepmother was the one who suggested it to me."). G.F. also claimed the letter was not an accurate reflection of her beliefs and thoughts:

> Q. You wrote a letter to the [j]udge. Do you recall doing that?
>
> A. Yes.
>
> Q. And it's titled dear presiding judge. How did you come up from [sic] saying dear presiding judge?
>
> A. I asked my parents what I should begin with because I really didn't know.
>
> Q. Okay. Are the rest of the words in that letters yours, theirs[,] or something else?
>
> A. Something else. It was both. I was the one who typed it in but [Mother] overviewed it and told me – she told me to take out a few things and to change a few things and gave me some ideas of what I should say.
>
> Q. Is that reflective of – is it true as it is written there?
>
> A. Not completely.

N.T., 9/13/23, at 24-25. G.F. further explained that the language in the letter was dictated by Parents. Specifically, G.F. testified that the letter's troubling statements that she was "addicted" to stealing, lying, and self-harm were
_(Footnote Continued Next Page)_

Q.     Why do you keep running away?

A.     Because I felt like something was wrong and I needed to tell someone but I was so confused that because I was hearing so many different things from different people, I felt like I was being wrong but my parents were telling me I wasn't [sic] and I didn't understand.  I had no other way to tell anyone because I had no access to the phone.  I don't have a phone myself, so I tried to get out the best I could.  I wasn't allowed to talk to my grandparents about anything in private, so I felt like I had no other way.

Q.     Did you feel safe?

A.     That I was also confused about because I didn't understand the difference between abuse and discipline because my parents were saying one thing and other people were saying another, so in my opinion I didn't feel safe but my parents were telling me I was.

*Id.* at 12-13.

Parents' response was to enact stricter and harsher methods of control. Specifically, Parents began to use leather dog leashes attached to G.F.'s belt loops to restrict her freedom of movement inside and outside the home by tethering her to large objects, or to her older siblings.  ***See id.*** at 9-10, 56-57.  G.F. testified that Parents also utilized a "bed monitor" in the home, which

---

mere references to G.F. eating food from the family's pantry outside of established mealtimes and her running away from home in order to escape Parents' excessive use of corporal punishment.  ***See id.*** at 26-28.  For her part, Mother flatly denied these allegations and claimed she had no involvement in G.F.'s drafting and sending of the letter.  ***See id.*** at 65.

Instantly, the trial court did not credit the averments in this letter and concluded that G.F. had not drafted it of her own free will.  Since this conclusion is supported by the record, we may not disturb it.

would sound an alarm if she left her bed before the morning. N.T., 9/13/23, at 30-31. G.F. explained that the door to her room was also locked. *See id.* at 31. These countermeasures prevented G.F. from using the restroom during the night without seeking the aid of Mother's adult daughter, who held the key. *See id.* at 31. During the day, Parents' also began to lock G.F. inside of the family's chicken coop for long periods of time while the Children were working outside on the farm. *See id.* at 33. Parents were also attempting to fit G.F. with a GPS monitoring device using zip ties on G.F.'s wrists at the time of her removal from their care. *See id.* at 21-22. G.F. persisted in her attempts to flee, which resulted in Mother physically striking and giving G.F. a bloody nose on one occasion. *See id.* at 18.

Critically, Parents' testimony does nothing to refute the Children's averments concerning the use of excessive discipline in their home. As noted above, both Mother and Father invoked their privilege against self-incrimination pursuant to the Fifth Amendment when questioned specifically concerning the use of corporal punishment and extent of discipline utilized in the home. *See* N.T., 8/25/23, at 7-12; N.T., 9/13/23, at 58-59, 60, 66. It is well-established that, "[w]hile a defendant in a civil case may invoke the privilege of the [F]ifth [A]mendment against self-incrimination, and invocation of the privilege may not be used against him in any way in a subsequent criminal prosecution, the trial court in a civil case may draw any adverse inference which is reasonable from the assertion of the privilege." *Sawko v.*

*Sawko*, 625 A.2d 692, 695 (Pa. Super. 1993). While Parents' were certainly entitled to invoke their constitutional privileges against self-incrimination, Pennsylvania courts are equally empowered to draw an adverse inference from such an assertion in a civil proceeding such as this one.

Finally, we also note that Mother's testimony reflects that the Children have not received regular medical and dental services since at least the time of Parents' marriage. *See* N.T., 9/13/23, at 60-61 (averring that the Children do not have "regular dental checkups" or "standard medical checkups").

Taken together, we observe no abuse of discretion or error of law in the trial court's findings of dependency in the cases *sub judice*. The record reflects that Parents rely upon an excessively harsh and unreasonably restrictive regime of corporal punishment and discipline in their unsuccessful attempts to strictly control the Children. While G.F. was unquestionably singled out for the worst of Parents' misbehavior to the exclusion of the others, our case law clearly provides that Parents' unreasonable actions with respect to a single child may have definitive and serious implications for all of the children in a family. *See, e.g., In re G.T.*, 845 A.2d 870, 872-73 (Pa. Super. 2004). Moreover, the record indicates that Parents have failed to ensure that the Children enjoy regular medical care during their tender years.

Based upon the foregoing, no relief is due on Parent's third claim. Accordingly, we turn to Parents' final issue, which challenges the trial court's decision to remove the Children from Parents' home. *See* Parents' Brief at 33

("[T]he court did not adequately consider remedies for the [C]hildren other than placement outside the home[.]"). As framed, Parents' claims facially implicate the provisions of 42 Pa.C.S. § 6351 ("Disposition of dependent child") and Pa.R.J.C.P. 1512(a) ("Dispositional Findings Before Removal From Home"). However, Parents' arguments do not discuss these provisions with any specificity, but instead merely seek to re-litigate the various aspects of their claims for relief already detailed above. *See* Parents' Brief at 29-34. We discern that Parents are simply repeating their arguments that the trial court should not have adjudicated the Children dependent in the first place. *See id.* at 33 ("This matter could have been resolved short of a finding of dependency."). Based upon the discussions already set forth above, we discern no abuse of discretion or error of law in the trial court's holdings.

Overall, the trial court's findings are well-supported by competent evidence. Thus, we affirm the orders adjudicating the Children dependent.

Orders affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/14/2024